UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANN NESTOROWICZ, )<br>)<br>   Plaintiff, )<br>)<br>      vs. )<br>)<br>ELI LILLY & COMPANY, )<br>)<br>   Defendant. ) | CAUSE NO.  1:07-cv-1090-WTL-TAB |

### ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment. The motion is fully briefed, and the Court, being duly advised, **GRANTS** the Defendant's motion for the reasons set forth below.

### Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for

summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## Material Facts

The material facts of record, viewed in the light most favorable to Plaintiff Ann Nestorowicz, are as follow.

Nestorowicz moved from her native Australia to Indiana in 1997 to work for Defendant Eli Lilly & Company ("Lilly") as a Senior Molecular Biologist in the Diabetes and Obesity Research Group. In November 2004, Sotirios Karathanasis became Nestorowicz's supervisor. Despite her previously good performance record, Karathanasis gave Nestorowicz an unsatisfactory rating for 2004. The two subsequently discussed what Karathanasis believed she needed to do in order to improve her performance.

In February 2005, Karathanasis informed Nestorowicz that due to budgetary restraints the decision had been made to stop funding a project she had been working on. The project involved four mouse lines that were being bred to have certain characteristics. Karathanasis told Nestorowicz to stop working on the project and to decrease the costs associated with the mouse lines. Nestorowicz believed that her research was promising and that the mouse lines might be valuable to other scientists conducting similar work. Therefore, she suggested several alternatives to Karathanasis regarding what should be done with the mouse lines. Karathanasis and his supervisor, Jose Caro, gave Nestorowicz permission to cryopreserve the mouse lines so that Lilly would have them to use in the future if the opportunity arose and also to try to find scientists in academia who were conducting relevant research to whom the mice could be transferred. Nestorowicz made arrangements with the outside vendor that had been breeding the mice, Taconic, to begin the cryopreservation process. She also was successful in finding a

university researcher who was interested in the mouse lines, and informed Taconic that five breeding trios from each line were to be shipped to the university.[1]

For reasons that neither party explains in their briefs, procuring and transferring the breeding trios and completing the cryopreservation process took much longer than the couple of months that had been originally projected. By the fall of 2005, when Anne Miller became Nestorowicz's supervisor, it was still not complete. In November or December 2005, when Miller learned that money was still being spent on a project that was supposed to have ended many months earlier, she contacted Jean Labus in Lilly's Human Resources Department and asked her to conduct an investigation. Labus met with Karathanasis, Caro, Miller and Nestorowicz, reviewed emails and other relevant communications, and ultimately determined that Nestorowicz had failed to follow her supervisors' directives to cease work and expenditures on the project and that approximately $85,000 in additional expenses had been incurred, most of which was unauthorized. Labus discussed her findings and recommendations with a group of decisionmakers pursuant to Lilly's standard procedure, including Miller, Caro (Miller's supervisor), Kimberly Peterson (Labus's manager), and Lana Wietholter (Labus's director). Labus also obtained input from Lilly's Equal Employment Opportunity Department. The decision was made by the group that Nestorowicz's employment should be terminated for

---

[1]The Court gathers that cryopreserving the mice involved creating embryos (by breeding mice), testing the embryos to make sure they had the required characteristics, and then freezing a certain number of them. Also, transferring the mice to the university apparently involved more than simply shipping cages of mice. Instead, it seems that "breeding trios" of mice with the required characteristics were established using mice that were not needed for the cryopreservation process.

insubordination and misappropriation of funds.[2]  Nestorowicz was, in fact, terminated on February 20, 2006.

Prior to her termination, on December 16, 2005, Nestorowicz had met with Megan Fogarty in Lilly's Human Resources Department regarding her belief that she was being treated unfairly by her supervisor, Miller.  Nestorowicz also complained that her former supervisor, Karathanasis, had routinely treated her in a hostile and discriminatory manner.  Nestorowicz gave Fogarty several examples of ways in which she had been treated poorly.  When Fogarty told her that actionable discrimination had to be based on being a member of a protected class, Nestorowicz said that she had been discriminated against because she was Australian and a woman.  Fogarty conducted an investigation and reported back to Nestorowicz that she was unable to substantiate Nestorowicz's discrimination claim.

## Discussion

Nestorowicz asserts that her employment with Lilly was terminated in retaliation for her complaint of discrimination.  Title VII, 42 U.S.C. § 2000e-3(a), forbids an employer from discriminating against an employee who has opposed any practice made unlawful by Title VII or who has made a charge under Title VII.  A plaintiff may establish unlawful retaliation using either the direct method or the indirect method; Nestorowicz proceeds under the indirect method.  To survive summary judgment under this method, she must demonstrate that she (1) engaged in statutorily protected activity; (2) met Lilly's legitimate expectations; (3) suffered an adverse

---

[2] Nestorowicz asserts that she simply worked with Taconic to carry out the plan that had been approved by Karathanasis and Caro, that she kept them informed of the "delays, problems, cost concerns, and similar problems" that occurred, and that she could not have misappropriated any funds because she was not authorized to make expenditures and she did not receive or pay the bills from Taconic.

employment action; and (4) was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008). "Upon establishing these elements, the burden shifts to the employer to produce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action. If the employer succeeds here, then the burden shifts back to the employee to prove that these reasons were merely a pretext for discrimination." *Hancock v. Potter*, 531 F.3d 474, 478 (7th Cir. 2008) (internal quotation marks and citations omitted).

With regard to the first element, Nestorowicz argues that her December 16, 2005, meeting with Megan Fogarty constituted protected activity. In order to establish that she engaged in protected activity, Nestorowicz must demonstrate that she "complained about an act that she reasonably believed in good faith violated Title VII." *Firestine v. Parkview Health System, Inc.*, 388 F.3d 229, 234 (7th Cir. 2004) (citations and internal quotation marks omitted). "Only a groundless claim resting on facts that no reasonable person possibly could have construed as a case of discrimination could not constitute a statutorily protected activity." *Id.*

In this case, the evidence of record suggests that Nestorowicz did not contact Human Resources with the intent to make a complaint of gender or national origin discrimination; rather, her complaint was that she was not being treated fairly by Karathanasis and Miller and that Karathanasis had routinely treated her in a hostile manner. Fogarty testified that it was only after she explained to Nestorowicz "the types of things we investigate for discrimination" and told her that "what I needed to understand was how she was treated differently on the basis of some protected class, meaning race or gender or ethnic origin or religion . . ." that Nestorowicz

5

responded "well, then, it's because I'm female and I'm from Australia." Fogarty followed up on their meeting by sending Nestorowicz an email to which she attached her notes of their conversation, which included the fact that Nestorowicz was "not sure what the discrimination is on (being a woman or being Australian)." Nestorowicz responded to Fogarty with an email that included the following:

> Also, one point that I would like to clarify is that I am unsure of whether my definition of discrimination is used in the same way that Lilly might use this term in a legal /HR sense. From my viewpoint, I use this term to describe the treatment of an employee based on personal bias, partiality or prejudice rather than individual merit and that this treatment negatively impacts an employee's career and/or work environment. So, personal bias, partiality or prejudice could include simply disliking someone (for any number of unstated reasons ) as well as the usual categories of race, gender , sex or age. 1 do not know if my definition or perception of discrimination as I feel it has been applied to me would alter the way in which you would proceed.

Lilly argues that these facts, all of which are undisputed by Nestorowicz, demonstrate that Nestorowicz did not, in fact, have a good faith belief that the behavior about which she was complaining was based upon her gender or her national origin; rather, she believed that she was being treated unfairly because her supervisors disliked her for "unstated reasons."

The inference drawn by Lilly from the facts of record is certainly a reasonable one. Whether it is the only reasonable inference is, in the Court's view, a close call. If it is, then Nestorowicz has failed to demonstrate that she engaged in protected activity. The Court need not resolve this issue, however, because, as explained below, even if it is resolved in Nestorowicz's favor, she fails to establish a prima facie case.

As for the second element, whether Nestorowicz was meeting Lilly's legitimate expectations, in cases such as this one in which the adverse employment action was a disciplinary action, the second and fourth elements merge. *See Lucas v. Chicago Transit*

*Authority*, 367 F.3d 714, 728 (7th Cir. 2004).  There is no question that Nestorowicz satisfies the third element; her termination was an adverse employment action.

That leaves the fourth element–whether Nestorowicz can point to a similarly situated employee who did not complain of discrimination and was treated more favorably than she was. Nestorowicz's entire argument on this issue is as follows:

> Dr. Michael is a Senior Biologist like Nestorowicz.  He was intimately involved in her experiment.  He coordinated with Taconic labs in the animals and protocol. Michael was involved in the phase out with Taconic throughout 2005.  He and Nestorowicz collaborated as peers. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th Cir. 2007).

Nestorowicz Response at 5.  However, Michael was not similar to Nestorowicz in one absolutely critical respect:  he was not the one who was told to discontinue the mouse lines and the experiment; she was.  Michael could not be found insubordinate for failing to do something that he was never told to do.

"When a plaintiff claims that [s]he was disciplined more harshly than a similarly situated employee based on some prohibited reason-a plaintiff must typically show that the two employees engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 592 (7th Cir. 2009) (citation and internal quotation marks omitted). Nestorowicz alleges that the evidence shows that Michael was kept informed of the "delays, problems, cost concerns, and similar problems" associated with cryopreserving the mice lines, but there is absolutely no evidence that Michael had any responsibility for the mouse lines. Instead, the evidence is undisputed that Nestorowicz, not Michael, was told to eliminate the expenses relating to the mouse lines and that she, not he, was responsible for working with

Taconic to preserve and transfer them.[3] Therefore, the two were not similarly situated for Title VII purposes, and Nestorowicz has failed to establish a prima facie case of retaliation. *See, e.g., id.* ("Without a similarly situated employee, Plaintiffs cannot present a prima facie case and their claim must fail.").[4]

## Conclusion

For the reasons set forth above, Lilly's motion for summary judgment is **GRANTED**.

SO ORDERED:  08/19/2009

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to:

Craig M. Borowski
BAKER & DANIEL
cmborows@bakerd.com,paula.calhoun@bakerd.com

Ellen E. Boshkoff
BAKER & DANIELS
ellen.boshkoff@bakerd.com,paula.calhoun@bakerd.com

Michael Charles Kendall
KENDALL LAW OFFICE
mckatlaw@aol.com

---

[3] While Nestorowicz disputes Lilly's assertion that she failed to follow the order to end the project and arrange for the cryopreservation of the mice, she does not dispute that she was, in fact, given the order.

[4] In light of this determination, it is unnecessary to consider Nestorowicz's argument that Lilly's stated reason for terminating her was pretextual.